**SHERBB ELIZEE, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Crim. No. 2008-0043
Supreme Court of the Virgin Islands
October 1, 2010

467

468

KELE ONYEJEKWE, ESQ., Territorial Public Defender, St. Thomas, USVI, *Attorney for Appellant.*

PAUL J. PAQUIN, ESQ., Department of Justice, St. Croix, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; SWAN, *Associate Justice.*

## OPINION OF THE COURT

(October 1, 2010)

CABRET, J. After Sherbb Elizee brought her infant son to the hospital with life-threatening injuries, the People of the Virgin Islands charged her with aggravated child neglect and neglect of parental duty. A jury convicted Elizee of both offenses, and she filed this appeal challenging the wording of the Information charging her with the offenses, the sufficiency of the evidence presented at trial, and the Superior Court's jury instructions. For the reasons which follow, we will affirm Elizee's conviction for neglect of parental duty, but reverse her conviction for aggravated child neglect and remand the matter for a new trial on that charge.

## I. FACTS AND PROCEDURAL BACKGROUND

The record shows that the victim in this case is Elizee's infant child, J.B. At the time of the offenses J.B. was seventeen months old, and Elizee was approximately twenty years old. Elizee and J.B. lived in a house that they shared with Elizee's twenty-five year old boyfriend,

 

Amijah Charles ("Amijah"), Amijah's brother, Kevin Charles ("Kevin"), Kevin's girlfriend, Liza Lord, and Elizee's cousin, Reynold Alexander.

The charges against Elizee stem from a series of injuries sustained by J.B. over a one week period during April of 2007. On April 18, 2007, J.B. was playing at home with Kevin's three-year-old son when J.B. fell and injured his chin. Because neither Elizee nor Amijah owned a vehicle, Amijah borrowed a car and they took J.B. to the hospital emergency room. J.B. was treated for a laceration on his chin, and Elizee was instructed to make an appointment to bring J.B into the hospital's health clinic three days later. Elizee did not schedule the appointment, nor did she bring J.B to the clinic as instructed.

On April 23, 2007, J.B. was outside his house playing with Kevin's son and Elizee. According to Elizee:

> We were outside, we were playing with a ball, and [J.B.] was up on the ramp and then the ball came down. When [J.B.] came down, when he was running down to get the ball, he fall . . . . I heard him crying and when I look I saw him, he fell down and he stand up right away, but he was still crying, so I just pick him up [sic].

(J.A.II 119-20.) Elizee testified that she did not believe it was a serious injury and described it as a "small bump." (J.A.II 135.) Elizee treated the injury by applying ice to the bump.

Conflicting with Elizee's testimony that J.B. injured himself while playing outside on April 23rd, was the fact, judicially noticed by the trial judge, "that St. Thomas received very heavy rain on April 23, 2007." (J.A.II 260.) Although Elizee acknowledged that it "was raining in the morning," (J.A.II 135) she claimed in her trial testimony that J.B. injured his head "in the afternoon." (J.A.II 136.) In a statement given to the police, however, Elizee indicated that J.B. and Kevin's son were outside playing in the morning.

In addition to this inconsistency, there were conflicts in the evidence concerning when Elizee first noticed certain bruises on J.B.'s body. In a statement Elizee gave to police on the afternoon of April 24th, Elizee was asked: "When did you first notice the mark on [J.B.]?" (J.A.II 43.) Elizee answered: "Yesterday morning while they were out playing." (J.A.II 43.) In her statement, Elizee indicated she noticed one mark between J.B.'s eyes and another on his neck. In her statement Elizee did not describe the

mark between J.B.'s eyes, but she declared that the mark on his neck was a "blue mark." (J.A.III 133.) At trial, however, Elizee stated that she first noticed the marks on the morning of April 24th, she denied that she described the neck mark as blue, and she insisted that the neck mark was only a "scratch" that resulted from J.B. "scratch[ing] his neck." (J.A.II 140.)

Around noon on the 24th, Elizee went shopping for groceries and various household items. Although Elizee often took J.B. shopping with her if Amijah could borrow a car, on this day no car was available so she left J.B. at home. According to Elizee, she left J.B. with her cousin, Alexander. Kevin was also at home that day. Elizee was out shopping for approximately one hour.

When Elizee returned from shopping, Alexander was outside working on a car, Amijah was home, and J.B. was in Elizee's bedroom. Elizee testified that she went into her bedroom, saw J.B. "sleeping," and then left the room to prepare some food. (J.A.II 110.) Approximately two to three minutes later, a friend, Richie Fontaine, who had come into the house to use the restroom, told Elizee that J.B. was not breathing properly. According to Elizee, she went into her bedroom and found J.B. sleeping. Elizee picked J.B. up and put him on her shoulder. Because J.B. did not immediately wake up, Elizee shook him on her shoulder and told him to wake up. At some point Elizee touched J.B.'s neck, back and chest to see if he was breathing. Eventually, Elizee testified, J.B. opened his eyes "and he started stretching and then he started breathing hard." (J.A.II 110.) Elizee told Amijah and Alexander what was happening, and Amijah told her that she needed to take J.B. to the hospital. Amijah borrowed a car, and they took J.B. to the emergency room.

When they arrived at the emergency room, J.B. was initially treated by Dr. Robin Ellett. Dr. Ellett testified that J.B. was in critical condition, unresponsive, and that his "respirations were distorted." (J.A.II 12.) Dr. Ellett also observed that J.B. "had a concentric bruise around his neck" that may have been caused by someone choking him. (J.A.II 15.) Dr. Ellett asked Elizee if J.B. had been choked, and Elizee responded: "maybe his [three-year-old] brother." (J.A.II 15.) Dr. Ellett did not believe this was possible because, she explained, "[i]t would have taken a bigger hand to make bruises all the way around like that. Stronger." (J.A.II 16.) Dr. Ellett's examination further revealed that J.B. was having a brain hemorrhage and that his injuries were "life threatening." (J.A.II 19.)

Dr. Ellett elaborated that J.B. had "bleeding in the brain, bleeding inside the skull and into brain tissue." (J.A.II 22). Although Dr. Ellett believed that J.B.'s head injuries were consistent with child abuse, conceivably from shaking the child, she did not determine whether that was the cause of the injuries.

J.B. was also examined that day by Dr. Iris Dottin, a pediatrician. Dr. Dottin testified that she arrived at the emergency room at "[a]pproximately 2:15 or 2:30" (J.A.I 260) and that her examination revealed, among other things, that J.B. "had bruises in specific areas of his body." (J.A.I 260.) Describing the bruises, Dr. Dottin stated: "Around his neck he had a purple lesion, and on his chest he had a purple lesion that indicates to me that those were injuries that had just happened no more than 24 hours prior and that they were forceful." (J.A.I 260-61.) Dr. Dottin noted that the "bruising around [J.B.'s] neck resemble[ed] strangulation" (J.A.I 263) and further stated that J.B. had swollen eyes, an open laceration on his chin, and purple bruises around his mouth and on his forehead.

Dr. Dottin ordered a CT scan which revealed bleeding in J.B.'s brain. When asked about possible causes of the bleeding, Dr. Dottin responded: "At [J.B.'s] age, there's only one thing that can produce it, it's trauma . . . . It would be a severe trauma basically where you take a child and you're jerking them." (J.A.I 267.) Dr. Dottin believed J.B.'s injuries were the result of "[c]hild abuse, maltreatment, Shaken Baby Syndrome." (J.A.I 272.) Due to the severity of J.B.'s injuries, a decision was made to transport him to Jackson Memorial Hospital in Miami, Florida were he could be treated by a neurosurgeon.

After obtaining treatment in Miami, J.B. returned to the Virgin Islands, where, upon petition to the Superior Court by the Department of Human Services ("DHS"), the Family Division ordered that he be placed in the "[t]emporary legal custody of . . . the Department of Human Services." *People In the Matter of the Application of the Dep't of Human Servs. for the Temp. Care, Custody and Control of [J.B.],* Super Ct. Fam. No. 016/2007 (V.I. Super. Ct. May 16, 2007) (temporary custody order). In response to the Family Division's order, DHS placed J.B. in the Sister Emma Cottage at the Queen Louise Home on St. Croix. Dr. Anthony Ricketts, who examined J.B. when he first arrived at the facility, testified that J.B. was suffering from diffused hypoxic brain injury. Dr. Ricketts explained that the injury is caused "[i]n a situation where you obstruct or

you stop that flow of either oxygen or blood to the brain, [and] you subsequently develop brain injury." (J.A.I 228.)

As a consequence of J.B.'s injuries and his subsequent need for the care and protection ordered by the Family Division of the Superior Court, the People of the Virgin Islands charged Elizee with two crimes. In Count I of the Amended Information, the People charged:

> Between March 30, 2007 and April 24, 2007, in St. Thomas, U.S. Virgin Islands, **SHERBB ELIZEE**, being the person responsible for the safety or welfare of a child, to wit being the mother of J.B., who was approximately seventeen months old, did neglect J.B. in that she allowed J.B. to be placed in a situation which a reasonable person should know is dangerous to the child's health or welfare by leaving J.B. in her home with other persons while she was out of the home, knowing or having reason to believe that J.B. had been abused or was in danger of being abused and that as a result of such neglect J.B. suffered serious and permanent physical injury in violation of violation of [sic] 14 V.I.C. 506(1). (**AGGRAVATED CHILD NEGLECT**).

(J.A.I 6.) In Count II of the Amended Information, the People charged:

> Between March 30, 2007 and April 24, 2007 in St. Thomas, Virgin Islands, **SHERBB ELIZEE** did commit an act, to wit leaving her child J.B., who is approximately seventeen months old in her home with other persons while she left the home, knowing or having cause to know that J.B. had been abused and was at risk of further abuse, causing J.B. to become in need of the care and protection of the Juvenile And Domestic Relations Division of the Superior Court; to wit Family Court in violation of 14 V.I.C. 481(a). (**NEGLECT OF PARENTAL DUTY**).

(J.A.I 6-7.)

The evidence recounted above was adduced at trial. In addition, Elizee testified and denied that she ever abused J.B. and further insisted that she was not aware of anyone else ever abusing the child. Elizee testified that Alexander, the cousin with whom she left J.B. while she went shopping, has children of his own. According to Elizee, there was nothing in Alexander's behavior that would have made her apprehensive about leaving J.B. with him. Elizee's boyfriend, Amijah, also testified at trial.

Amijah stated that Elizee had left J.B. with Alexander on prior occasions and he, Amijah, never got the impression that Alexander had done anything inappropriate to J.B.

As part of the Superior Court's preliminary and final jury instructions, the judge charged the jury as follows on the elements of aggravated child neglect:

> In order to prove the offense of aggravated child neglect as charged in Count I of the Information, the People must prove each of the following elements beyond a reasonable doubt: 1) that between March 30, 2007 and April 24, 2007, in St. Thomas, Virgin Islands, 2) Sherbb Elizee, 3) as the mother of an infant referred to as J.B. . . . was responsible for the safety and welfare of J.B., 4) that she knowingly, recklessly or negligently, 5) *caused* or allowed J.B. to suffer physical, mental or emotional injury, 6) and J.B. suffered serious physical injury *as a result of that abuse* or neglect.

(J.A.II 271.) (Emphasis added).

Following deliberations, the jury found Elizee guilty of both aggravated child neglect and neglect of parental duty. The Superior Court sentenced Elizee to, among other terms, ten years incarceration for her conviction on the charge of aggravated child neglect and a concurrent one year term of incarceration for her conviction on the charge of neglect of parental duty.

Elizee filed this appeal challenging the wording of the Information, the court's jury charge on the elements of aggravated child neglect, and the sufficiency of the evidence.

## II. JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction over this criminal appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which provides that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law."

We exercise plenary review over questions of law and statutory construction. *Gilbert v. People*, 52 V.I. 350, 354 (V.I. 2009).

In reviewing Elizee's challenge to the sufficiency of the evidence,

> we apply a particularly deferential standard of review. Following a criminal conviction, we view the evidence presented at trial in a light

most favorable to the People. We will affirm a conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Smith v. People*, 51 V.I. 396, 397-98 (V.I. 2009) (citations and quotation marks omitted).

■ Because Elizee did not object at trial to the Superior Court's jury instruction on aggravated child neglect, we review her claim for plain error under Rule 52(b) of the Federal Rules of Criminal Procedure. *See United States v. Marcus*, ___ U.S. ___, 130 S. Ct. 2159, 2164, 176 L. Ed. 2d. 1012 (2010). Under the plain error rule,

> an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an "error"; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings"; and (4) "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

*Id.* (citations omitted).

## III. DISCUSSION

### A. The Superior Court's Jury Instruction On The Elements of Aggravated Child Neglect Constituted Plain Error.

Elizee asserts that the Superior Court erred in charging the jury on the elements of aggravated child neglect because the court's charge allowed the jurors to convict her of either aggravated child neglect or aggravated child abuse even though she was charged with only the former offense. We agree.

■ Initially, we note that Elizee did not object to the Superior Court's instruction. Federal Rule of Criminal Procedure 30(d) states:

> A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. An opportunity must be given to object out of the jury's hearing and, on request, out of the jury's presence. Failure to object in

accordance with this rule precludes appellate review, except as permitted under Rule 52(b).

FED. R. CRIM. P. 30(d).[1] Under Rule 52(b), "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." FED. R. CRIM. P. 52(b). In reviewing such unpreserved charging errors, the Court of Appeals for the Third Circuit has cautioned that " '[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' " *United States v. Palmeri*, 630 F.2d 192, 201 (3d Cir. 1980) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S. Ct. 1730, 1736, 52 L. Ed. 2d 203 (1977)). This is such a rare case.

■ The offense of aggravated child neglect was established by the Legislature as part of the Child Protection Act of 1992 (the "Act"). The Act defines the offense of "child neglect" as follows:

> Any person who is responsible for the safety or welfare of a child, including, but not limited to, a child's parent, stepparent, guardian, schoolteacher, or baby sitter, who neglects a child, or who knowingly, recklessly or negligently causes or allows a child to suffer physical, mental or emotional injury, or who knowingly, recklessly or negligently deprives a child of any of the basic necessities of life, shall be punished by a fine of not less than $500, or by imprisonment of not more than 15 years, or both.

V.I. CODE ANN. tit. 14, § 504 (1996). The language of section 504 indicates that the Legislature intended to create three alternate means or modes of committing child neglect: (1) by neglecting a child as that term is defined in section 503(e) of the Act;[2] (2) by knowingly, recklessly or negligently causing or allowing a child to suffer physical, mental or emotional injury; or (3)

---

[1] Federal Rule of Criminal Procedure 30 is made applicable to criminal proceedings in the Virgin Islands Superior Court pursuant to Superior Court Rule 7, which states that: "[t]he practice and procedure in the [Superior] Court shall be governed by the Rules of the [Superior] Court and, to the extent not inconsistent therewith . . . the Federal Rules of Criminal Procedure . . . ."

[2] Under section 503(e):

'Neglect' means to place a child or allow a child to be placed in a situation which a reasonable person should know is dangerous to the child's health or welfare, and includes, but is not limited to, the following:

476

by knowingly, recklessly or negligently depriving a child of any of the basic necessities of life. *See id.*

██ ██ Under section 505, the Legislature defined the separate offense of "child abuse," 14 V.I.C. § 505 (1996),[3] and under section 506, the Legislature defined yet two more distinct offenses: aggravated child abuse and aggravated child neglect. 14 V.I.C. § 506 (1996). Section 506 provides:

> A person perpetrates an act of aggravated child abuse *or* neglect when:
> (1) the child suffers serious physical injury; or
> (2) the child suffers serious mental or emotional injury; or
> (3) the child dies from such abuse or neglect. A person who is convicted of aggravated child abuse or neglect shall be punished by imprisonment of not less than 5 years but not more than 30 years.

(Emphasis added). A plain reading of section 506 reveals that the Legislature intended to create two separate offenses, aggravated child abuse and aggravated child neglect, and to promulgate multiple, alternative aggravating factors that can lead to a conviction of either aggravated child neglect or aggravated child abuse. *See id.; see also generally Gilbert*, 52 V.I. at 357 (observing that an aggravated crime is one that is " 'made worse or more serious by circumstances.' " (quoting *Black's Law Dictionary* 71 (8th ed. 2004))).

---

(1) leaving a child unsupervised, taking into account the age and developmental stage of the child;

(2) denying or failing to provide a child with shelter, food, clothing, medical care or education;

(3) leaving a child in the care of any person known to use, possess or sell illegal drugs or abuse alcohol;

(4) leaving a child in the care of any person known to have engaged in sexual activity with any child;

(5) leaving a child in the care of any person known to be incapable of providing adequate care for a child; and

(6) keeping a child under the age of 16 years home from school to care for other children.

14 V.I.C. § 503(e) (1996).

[3] We note that in *Gov't. of the V.I. v. Ayala*, 853 F. Supp. 160, 29 V.I. 123 (D.V.I. 1993), the District Court of the Virgin Islands declared section 505 unconstitutionally vague. Because the issue is not before us, we render no opinion on the constitutionality of section 505 or any other provision in the Act.

In the instant case it is patently clear, and indeed undisputed, that the People charged Elizee with committing only aggravated child neglect.[4] The Information substantially tracks the language of the relevant child neglect statutes by alleging that Elizee, as J.B.'s parent, neglected the child by "plac[ing him] in a situation which a reasonable person should know is dangerous to the child's health or welfare." (J.A.I 6.) More specifically, the Information alleged that Elizee left "J.B. in her home with other persons while she was out of the home, knowing or having reason to believe that J.B. had been abused or was in danger of being abused" (J.A.I 6), *see* 14 V.I.C. §§ 504, 503(e), and cites to section 506(1) in charging that "as a result of *such neglect* J.B. suffered serious and permanent physical injury." (J.A.I 6.) (Emphasis added). Conspicuously absent from the Information is any allegation that Elizee personally abused J.B. Nevertheless, the Superior Court's jury instructions allowed the jury to convict her if the jurors found that she "caused" J.B. to suffer physical injury and "J.B. suffered serious physical injury as a result of that abuse . . . ." (J.A.II 271.)

██ ██ The Revised Organic Act of 1954 requires that a criminal defendant "be informed of the nature and cause of the accusation" against him. Revised Organic Act of 1954, § 3, 48 U.S.C. § 1561, *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 86 (1995) (preceding V.I. CODE ANN. tit. 1). While the Superior Court "may permit an information to be amended at any time before the verdict," it may not do so if "an additional or different offense is charged or a substantial right of the defendant is prejudiced." FED. R. CRIM. P. 7(e). Considering the variance between the Information in this case, which charged only aggravated child neglect, and the Superior Court's charge to the jury, which permitted the jurors to consider whether Elizee committed either aggravated child neglect or aggravated child abuse, the court's charge amounted to an impermissible amendment under Rule 7(e) and was, therefore, legally erroneous. And, because this error was clear and not subject to reasonable dispute, we conclude that Elizee has demonstrated that the error satisfied the first two criteria of the plain error test. *See Marcus*, ___ U.S. at ___, 130 S. Ct. at 2164.

---

[4] In their appellate brief, the People acknowledge that they charged Elizee with aggravated child neglect and not aggravated child abuse, but they contend that Elizee has not shown that the Superior Court's jury instruction constituted plain error.

To satisfy the third criterion of the plain error test, which requires that the error affected the defendant's substantial rights, the "error must be 'prejudicial,'" which means that there must be a reasonable probability that the error affected the outcome of the trial." *Marcus*, ___ U.S. at ___, 130 S. Ct. at 2164 (citing *United States v. Olano*, 507 U.S. 725, 734-35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Because the People charged Elizee solely with aggravated child neglect and the Superior Court's preliminary and final instructions permitted the jury to find her guilty of either aggravated child neglect or aggravated child abuse, a distinct offense from that charged in the Information, we find that the error was prejudicial. *Francis v. State*, 36 S.W.3d 121, 124 (Tex. Crim. App. 2000) ("[A]lternate theories of committing the same offense were not submitted to the jury in the instant case. Rather, two separate offenses were submitted to the jury in the disjunctive.")[5] The Peoples' Information, and the theory of the prosecution, was that Elizee neglected J.B. by leaving him in the care of others, and that she knew or should have known that this placed him in danger of being abused. Elizee was prejudiced because, relying on the plain language of the Information, she could not have known that she should have prepared a defense against a charge that she personally abused J.B. and, thereby, was guilty of aggravated child abuse. *Gov't of the V.I. v. Joseph*, 765 F.2d 394, 398 (3d Cir. 1985) ("The variance between the information and the verdict thus violated Joseph's right to be notified of the charge against him so that he could adequately defend himself at trial."); *Gov't of the V.I. v. Aquino*, 378 F.2d 540, 554, 6 V.I. 395 (3d Cir. 1967) ("One who is charged with having committed the offense of rape can hardly know that he should prepare a defense to a claim that he had assisted someone else, who had committed the crime, to avoid apprehension or punishment. Such a difference between the charge and the verdict involved the substantive rights of Aquino and is not a variance which could be eliminated by a simple amendment authorized by

---

[5] Contrary to the Peoples' argument, this issue is not governed by *Griffin v. United States*, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1992). *Griffin* involved "a general jury verdict under a single count charging the commission of an offense by two or more means." 502 U.S. at 50, 112 S. Ct. at 469 (emphasis omitted). As explained above, the Superior Court's charge in this case did not merely allow the jurors to convict Elizee of aggravated child neglect if they found that she committed that crime by one of two or more alternative means, but instead allowed the jurors to convict Elizee of a totally different offense than was charged in the Information.

479

Rule 7(e) of the Federal Rules of Criminal Procedure." (Footnote omitted)).

■ Furthermore, there is a reasonable probability, based on the evidence recounted above, that at least one of the jurors convicted Elizee of aggravated child abuse, even though she was not charged with that offense. While the evidence showed that J.B. was in the care of Elizee and other individuals at different times during the period in which he was injured, there was no direct evidence presented at trial establishing who inflicted the serious physical injuries. Considering the totality of the evidence, and the fact that Elizee gave sometimes conflicting testimony concerning some of J.B.'s injuries, there is a reasonable probability that at least one juror found Elizee not guilty of neglecting J.B. by leaving him with others, as alleged in the Information, yet found that she personally inflicted the injuries and was, therefore, guilty of aggravated child abuse. Even if only a single juror based his or her verdict on such a finding, it would have affected Elizee's right to a unanimous jury verdict on the charged crime of aggravated child neglect. *See generally Ambrose v. People*, 50 V.I. 325, 335 (V.I. 2008) (per curiam) ("In both territorial and federal courts, unanimity of a jury is required for a valid verdict in a criminal trial." (Citations omitted)); *see also Pizzo v. State*, 235 S.W.3d 711, 719 (Tex. Crim. App. 2007) ("[T]he instruction here allowed the jury to convict Pizzo without reaching a unanimous verdict on the same act. It is possible that six jurors convicted Pizzo for touching the breasts of [the victim] while six others convicted Pizzo for touching the genitals of [the victim].") Although this Court cannot say with certainty how the jurors evaluated this testimony, because there is a reasonable probability that the Superior Court's preliminary and final jury instructions affected the outcome of the trial, that error affected Elizee's substantial rights and satisfied the third criterion of the plain error test. *See Marcus*, ___ U.S. at ___, 130 S. Ct. at 2164; *Joseph*, 765 F.2d at 397-98; *Aquino*, 378 F.2d at 554.

■ We also find that the Superior Court's charge "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Marcus*, ___ U.S. at ___, 130 S. Ct. at 2164. Because the jurors were instructed that they could find Elizee guilty of aggravated child neglect if they found that Elizee committed either aggravated child neglect *or* aggravated child abuse, "[w]e have no means of knowing on what basis the jury convicted" her of aggravated child neglect. *United States v.*

*Dobson*, 419 F.3d 231, 241 (3d Cir. 2005). As explained above, Elizee had the right to a unanimous jury verdict on the charged offense, yet we do not know whether all of the jurors, some of the jurors or none of the jurors actually found Elizee guilty of aggravated child neglect, or alternatively, aggravated child abuse. *See id; Pizzo*, 235 S.W.3d at 719.

 Because Elizee had no notice that she was on trial for aggravated child abuse and the Superior Court's jury instruction permitted the jurors to convict her of that offense or the charged offense of aggravated child neglect, we conclude that the Superior Court's instruction seriously affected the fairness of the trial and, therefore, constituted plain error.

 Before addressing the consequences of the Superior Court's charging error, we must consider Elizee's assertion that the evidence presented at trial was insufficient for the jury to find her guilty of aggravated child neglect. We consider this assertion because, although a court's erroneous jury instruction may entitle the defendant to a retrial, "a reversal for evidentiary insufficiency is considered to be the equivalent of an acquittal." *McMullen v. Tennis*, 562 F.3d 231, 237 (3d Cir. 2009).

Elizee argues that she is entitled to an acquittal because the evidence merely showed that she left J.B. in her home with other individuals, none of whom were shown to be incompetent to care for the child. Elizee further contends that the evidence was insufficient because, even if she left J.B. in the care of another individual who abused the child, there was no evidence establishing her culpability for that abuse. We reject both assertions.

 Mindful that on appeal we view the evidence in a light most favorable to the People, a rational trier of fact could have found Elizee guilty of aggravated child neglect. We note initially that the evidence undisputedly showed that J.B. suffered serious, indeed life-threatening, physical injuries. Both the emergency room treating physicians who testified at trial said as much, and while one of these physicians opined that the injuries were merely consistent with child abuse, the other expressly stated that she believed the injuries were the result of "[c]hild abuse, maltreatment, Shaken Baby Syndrome." (J.A.I 272.) This evidence was not disputed at trial. Thus, a rational trier of fact could have found that J.B. had been abused and that this abuse resulted in serious physical injuries.

As discussed above, Elizee was not charged with personally inflicting these injuries on J.B. Rather, the Information specifically charged that

Elizee left "J.B. in her home with other persons while she was out of the home, knowing or having reason to believe that J.B. had been abused or was in danger of being abused." (J.A.I 6.) *See* 14 V.I.C. §§ 504, 503(e). While Elizee is correct that the evidence did not show who, precisely, injured J.B., this deficiency is not fatal to the jury's finding of guilt. The crux of the People's aggravated neglect charge was that Elizee was culpable for J.B.'s serious injuries because she left the child at home in the care of others, knowing or having reason to know that he was in danger of being abused. Elizee admittedly left J.B. at home in the care of others while she went shopping, and the evidence showed that she had reason to know that this placed him in danger of being abused. Elizee gave conflicting accounts as to the cause and description of the injuries she noticed on J.B. *before* she left him at home to go shopping on the 24th, and the jurors were free to believe or disbelieve these accounts as they saw fit. *See United States v. Boone*, 279 F.3d 163, 189 (3d Cir. 2002); *see also Smith v. People*, 51 V.I. 396, 398 (V.I. 2009). These injuries included a bump on his head, a mark between his eyes, and a bruise on his neck. While the severity of the bump and mark might have been questionable, the jury learned that the bruise on J.B.'s neck "resemble[ed] strangulation." (J.A.I 263.) Inasmuch as Elizee denied that she caused any of these injuries, and considering the severity of the neck bruise, a reasonable trier of fact could have found that Elizee should have known that J.B. had been abused by someone in the home and that he was in danger of being abused again when she left him to go shopping. Under these circumstances, there is no merit in Elizee's assertion that the evidence was insufficient to support her conviction for aggravated child neglect.

Having determined that the evidence was sufficient, Elizee is not entitled to an acquittal on the charge of aggravated child neglect. Because, however, the Superior Court erred in its charge to the jury on elements of aggravated child neglect, and this erroneous instruction constituted plain error, Elizee's conviction for aggravated child neglect will be vacated and the matter will be remanded for a new trial on this count. *See Dobson*, 419 F.3d at 241 (remanding for new trial based on erroneous instruction); *United States v. Choy*, 309 F.3d 602, 608 (9th Cir. 2002) (requiring retrial upon finding fatal variance).

## B. The Evidence Was Sufficient To Support Elizee's Conviction On The Charge Of Neglect Of Parental Duty.

Turning to Elizee's remaining assertion of error, we find no merit in her argument that the evidence was insufficient to convict her of neglect of parental duty. The crime of neglect of parental duty is defined by title 14, section 481(a) of the Virgin Islands Code. Section 481(a) provides, in pertinent part:

> Whoever commits any act or omits the performance of any duty, which act or omission causes a child under the age of 18 to become in need of the care and protection of the juvenile and domestic relations division of the [Superior Court] of the Virgin Islands, shall be fined not more than $500 or imprisoned not more than 1 year, or both.

14 V.I.C. § 481(a) (1996). In this case, Elizee asserts that the evidence presented at trial was insufficient to convict her of this offense because "the family court did not find that Elizee's conduct or omission was the reason for [J.B.'s] protection by the court." (Appellant's Br. 35.) More specifically, Elizee argues that the People "failed to show any 'neglect' on the part of Sherbb Elizee" (Appellant's Br. 36), and the Family Court's custody order was merely a consent order that did not attribute J.B.'s need for protection to Elizee. We disagree.

█ The evidence presented at trial, viewed in a light most favorable to the prosecution, was sufficient for a rational trier of fact to find that Elizee neglected J.B. That evidence showed that Elizee failed to follow-up with the medical care ordered by the hospital after J.B. injured his chin. More importantly, however, the evidence showed that although J.B.'s body was covered with severe bruises, some of which Elizee acknowledged she noticed on the morning of April 23rd, she did not seek any medical attention that day and on the following day she left the infant with others in her home while she went shopping. To the extent that Elizee claimed ignorance as to the origin of these bruises, the jurors might have found that it was neglectful for her to not seek immediate medical attention and to leave J.B. with others who might have inflicted the injuries. Even if the jurors believed that Elizee first noticed the injuries on the morning of April 24th, they could have found that, considering the severity of the injuries, it was neglectful to not immediately seek medical care instead of going shopping. And, considering the numerous

inconsistencies in Elizee's accounts of when J.B. fell and when she noticed the bruises, the jury might have totally discredited her explanation that J.B. fell while outside playing ball. Without further belaboring the point, a jury could have reasonably found that it was Elizee's acts or omissions that caused J.B.'s injuries and prompted the Family Division to enter its custody order. Thus, the evidence was sufficient for the jury to find Elizee guilty beyond a reasonable doubt of neglecting her parental duties.

## IV. CONCLUSION

The Superior Court's instructions to the jury on the elements of aggravated child neglect constituted plain error. The People only charged Elizee with aggravated child neglect, yet the court's instructions allowed the jury to convict her if she committed aggravated child abuse. Elizee had no notice that she was on trial for the latter offense, and there is a reasonable probability that at least some of the jurors found her guilty of that offense. Because the error seriously affected the fairness and integrity of the trial, Elizee's conviction on that charge will be vacated and the matter remanded for a new trial. On the other hand, there was sufficient evidence presented at trial to support Elizee's conviction for neglecting her parental duties. There was abundant evidence that the Family Division's order placing J.B. in the custody of DHS was necessitated by Elizee's act or omission in caring for the infant. Because the evidence presented at trial, viewed in a light most favorable to the prosecution, was sufficient for a rational trier of fact to find her guilty beyond a reasonable doubt that Elizee committed neglect of parental duties, her conviction on that offense is affirmed.